**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**Baltimore Division**

| | | |
|---|---|---|
| JASON R. BECK, | ) | |
| 11810 Glen Wessex Court | ) | |
| Tampa, FL  33626, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Civil Action No.:** _____ |
| | ) | |
| TECH USA, LLC, | ) | |
| 8334 Veterans Highway | ) | |
| Millersville, MD  21108, | ) | |
| | ) | |
| TECH USA, INC., | ) | |
| 8334 Veterans Highway | ) | |
| Millersville, MD  21108, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| Thomas B. Howell, | ) | |
| 477 Maple Road | ) | |
| Severna Park, MD  21146, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## COMPLAINT AND JURY DEMAND

Plaintiff, Jason R. Beck ("Beck"), by and through his undersigned counsel, brings this Complaint against Defendants Tech USA, LLC, Tech USA, Inc., and Thomas B. Howell ("Howell") and alleges as follows:

## NATURE OF THE ACTION

1.      This is an action for breach of contract, breach of fiduciary duty, and for a declaratory judgment against Plaintiff's former employer and business partner.

## THE PARTIES

2.      Plaintiff, Jason R. Beck, is the former president of Tech USA, Inc. and remains a minority shareholder of the company.  Beck resides at 11810 Glen Wessex Court, Tampa, FL 33626.  Howell as Chief Executive Officer of Tech USA, Inc. and majority shareholder thereof caused Beck to be fired on June 11, 2012.  Beck is a citizen of Florida.

3.      Tech USA, Inc. ("TUI") is a Maryland corporation with its principal place of business located at 8334 Veterans Highway, Millersville, MD  21108.  TUI provides staffing, consulting and subcontracting support to both governmental and commercial customers.  Howell owns 97% of the equity of TUI.  TUI is a citizen of Maryland.

4.      Tech USA, LLC ("TUL") is a Maryland limited-liability company formed on April 24, 2008, and operating at the same address as TUI.  On January 1, 2009, TUI exchanged certain of its assets and liabilities for a 95% membership interest in TUL, which became the operating entity.  TUI became a holding company with no material assets or operations other than its 95% membership interest in TUL.  TUL is a citizen of Maryland.

5.      Thomas B. Howell is an individual whose primary residence is 477 Maple Road, Severna Park, MD  21146.  Howell is a majority owner of TUI which owns 95% of TUL.  Howell is a citizen of Maryland.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332 as all the Defendants are citizens of Maryland whereas the Plaintiff is a citizen of Florida and the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs.

7.      Defendants are subject to personal jurisdiction in this Court because they maintain offices within this district and regularly conduct business within this judicial district.

8.      Venue is proper in this district pursuant to 28 U.S.C. § 1391, as a substantial part of the events or omissions giving rise to the claims occurred within this district.

## BACKGROUND FACTS

9.      In May 2005, Beck received and accepted an offer to become President of Tech USA, Inc., reporting only to Howell as CEO and the Board of Directors.  At the time Beck's employment began, he executed an employment agreement (2005 Agreement) which had a five-year term.

10.     Beck rendered services from TUI's Tampa, Florida offices and was not required to relocate to Maryland.  Initially, Beck received an annual base salary of $250,000 per year subject to a three percent (3%) per year increase for cost of living adjustment.  At the time Beck was fired on June 11, 2012, his annual salary had risen to $300,000.

11.     Pursuant to the 2005 Agreement, Beck was to receive a quarterly bonus based upon earnings before taxes and depreciation of assets per calendar year of TUI and its affiliates, subsidiaries, and any other staffing company owned or operated by Tech USA, Inc. or Howell.  In 2010, Beck received a bonus of $329,550.  In 2011, Beck's bonus was $381,000.

12.     Further pursuant to the 2005 Agreement, Beck was issued three percent (3%) of the capital voting class stock in TUI as of June 1, 2006.  TUI made distributions of profits each and every year Beck was president.  Based on his vested rights as an equity holder, Beck was to be paid three percent (3%) of each annual distribution.

13.     In 2010, profit distributions made for calendar year 2009 were approximately $7,000,000. For calendar year 2011, over $4,000,000 in distributions were made.  Based on his rights as a three

percent (3%) shareholder, Beck is still owed at least $250,000 in profit distributions that should have been made to him by TUI for calendar years 2009 and 2011, but were not.  Beck is further owed a pro-rata share of three percent (3%) of any profit distribution made for 2012.

14.     Section 5(i) of the 2005 Agreement provides that Beck is entitled to "Severance Pay" in the event of a termination without Cause.  By its own terms, Section 5(i) survives the expiration of the 2005 Agreement for a period of 25 years.   "Severance Pay" is defined in the 2005 Agreement as payment of one year's base salary, at the level of salary then being paid Beck as of the termination date, plus the average of Beck's last two 12-month periods' bonuses.  Section 5(i) requires the Severance Pay to be paid out over 52 weeks beginning one week after the termination becomes effective.

15.     The 2005 Agreement defines "Cause" to include, among other things, "any action taken by [Beck] that violates the direction of the CEO or Board of Directors (which directions are given in his or their reasonable business judgment) and results in a quantifiable, substantial financial harm to employer, or any act of negligence or misconduct by employee that results in a quantifiable, substantial financial harm to employer."

16.     Under Beck's leadership, revenues for TUI and its affiliates went from approximately $17,500,000 in 2005 to over $80,000,000 in 2011.   Beck increased the sales force from 15 to 45 employees and added over 100 new recruiters.  During his tenure, TUI grew from seven offices to fifteen.

17.     Until 2010, Howell and Beck would meet quarterly to discuss management of the business.  In 2010, however, Howell added Susan Warner and Greg Ponzoli to the senior management team.  Simultaneously, Howell began to cut Beck off from financial information and key decision-

making processes.  Through his actions, Howell made clear that he was looking for an excuse to unload Beck's compensation in order to maximize his personal profits.

18.     Without Beck's consent or participation, Howell created "front" companies to pose as women-owned businesses in order to obtain lucrative government contracts.  These companies were staffed with TUI sales people and were managed by TUI executives from TUI's offices.  Ultimately, Susan Warner was put in charge of one of these "front" companies despite the fact that she remained on TUI's/TUL's payroll.  When Beck complained that this charade could endanger the business of TUI, Howell undertook further efforts to drive Beck from the company by cutting him off from critical information and denying him a role in key business decisions.

19.     In May 2011, Beck's executive assistant complained that he had made some inappropriate remarks to her.  Beck denied the claim and the company's investigation did not uncover any wrongdoing.  No disciplinary action was taken against Beck as a result of this complaint.  Beck's executive assistant continued to work with him through the date of his termination.

20.     In late March or April 2012, TUI's general counsel, Grover Outland, reported to Beck that he had heard a rumor that a female employee had quit her employment with TUL because of Beck's "unwanted sexual advances/sexual harassment."  Beck informed Outland that the rumor was unfounded and offered to obtain an affidavit from the alleged complainant to the effect that she had never been harassed by Beck.  Outland refused to allow Beck to reach out to the alleged complainant and threatened him with termination if he did so.  The alleged complainant never filed a complaint against Beck.

21.     Outland further informed Beck that a current employee had accused Beck of having grabbed her bra strap from behind.  Beck denied the allegation and again no complaint was lodged by the allegedly affected employee.

22.     In reaction to the alleged complaints, Beck was ordered to complete a sensitivity training course offered by a company-approved provider and to sign a "Mutual Release Letter Agreement." Outland told Beck in no uncertain terms that if he did not execute the Mutual Release Letter Agreement and attend the sensitivity training, he would be immediately fired for Cause.  Fearful of losing his job, Beck attend the sensitivity training and executed the Mutual Release Letter Agreement on May 9, 2012.

23.     To further induce/coerce Beck into signing the Mutual Release Letter Agreement, Howell promised to repay Beck the $75,000 that Beck had invested in a related venture with Howell, operating under the name of Tech Direct Services, LLC ("TDS").  Through the end of 2011, TDS was operating profitably until Howell billed the company for his "consulting services," in an amount equal to TDS' profits.

24.     The Mutual Release Letter Agreement purports to release Tech USA, Inc., TDS, and Tech USA, LLC from any claims that Beck may have against them.  The Mutual Release Letter Agreement further purports to extinguish the terms of Section 5(i) of Beck's 2005 agreement and cut off his right to severance pay.

25.     TUI/TUL have materially breached the Mutual Release Letter Agreement by failing to cause the refund of Beck's investment in TDS as called for and as promised by Howell himself.

26.     Within weeks of having been coerced into signing the Mutual Release Letter Agreement, Greg Ponzoli, a senior manager of TUI, told Beck that he was being relieved of his duties because:  (1) Beck had insulted Susan Warner; (2) he had overly criticized a male senior vice president's business plan; (3) he had caused a female sales executive to cry when he critiqued her business plan; and (4) it was "just time for Beck to go."  Ponzoli further told Beck that he would be allowed to tell other employees that he had "resigned."  Ponzoli promised that the company would pay "four months' worth

of severance."   None of Beck's alleged actions provided as reasons for his termination resulted in quantifiable, substantial harm to TUI or TUL.

28.     Beck refused to execute a resignation letter that was proffered to him by Ponzoli, but did, in fact, comment to some subordinates that he was "resigning."

28.     Since his termination, Beck has made repeated requests for access to the books and records, including tax returns, and financial statements of TUI/TUL and its affiliates in order to facilitate the appraisal of his three percent (3%) equity interest, as called for by the 2005 Agreement.   Each request has been denied.   However, in September, Outland forwarded a condensed consolidated balance sheet and statement of operations for the year ended December 31, 2011.   As an equity holder Beck has statutory rights to inspect <u>all</u> information regarding the state of the business and financial condition of the company and its affiliates and all other information regarding the affairs of the company as is just and reasonable for any purpose reasonably related to the equity holder's interest.

29.     In an apparent effort to justify its failure to pay severance to Beck, TUI/TUL has currently taken the position that Beck voluntarily resigned.   Howell told Beck's father that Beck had resigned.

### COUNT I
### (Declaratory Judgment)

30.     Beck incorporates by reference paragraphs 1 through 29 above as if fully set forth herein.

31.     An actual controversy exists between Beck and TUI/TUL as to their respective rights and obligations pursuant to the May 9, 2012, Mutual Release Letter Agreement and the 2005 Agreement.

32.     Beck seeks a declaratory judgment that the Mutual Release Letter Agreement is rescinded and null and void because his execution of the Mutual Release Letter Agreement was involuntary, made

under duress, and coerced, lacked consideration, and TUI/TUL have materially breached the Mutual Release Letter Agreement.

33.      Beck seeks a further declaratory judgment that he is entitled to receive three percent (3%) of TUI/TUL's annual profit distributions for 2012.

34.      Beck seeks a further declaratory judgment declaring that Beck has a right to inspect the books and records of TUI/TUL pursuant to Maryland Code, Corporations and Associations, § 4-403 and/or § 4A-406.

**COUNT II**
**(Breach of Contract)**

35.      Beck incorporates by reference paragraphs 1 through 29 above as if fully set forth herein.

36.      TUI/TUL entered into various agreements with Beck pursuant to which he was to receive three percent (3%) of each annual distribution of profits as a minority shareholder and to be paid $300,000 plus the average of his 2010 and 2011 bonuses upon his termination without cause.

37.      The terms of the agreements were reasonable and enforceable and Beck has performed all of his obligations thereunder and satisfied all conditions precedent.

38.      TUI/TUL have breached their contractual obligations by failing to pay Beck at least $250,000 in profits from calendar years 2009 through 2011.

39.      Because Beck was fired on June 11, 2012, without "Cause" as "Cause" is defined in his 2005 Agreement, TUI/TUL has breached Section 5(i) of the 2005 Agreement by failing to pay severance in the amount of $651,000 in 52 installments beginning the week of June 18, 2012.  ($300,000 base pay as of June 2012 plus the average of Beck's 2010 bonus of $329,550 and his 2011 bonus of $381,000 or $351,000 = $651,000.)

40.     Beck has suffered damages as a result of TUI/TUL's breaches.

## COUNT III
### (Breach of Fiduciary Duty against Howell)

41.     Beck incorporates by reference paragraphs 1 through 29 above as if fully set forth herein.

42.     As a majority equity holder in TUI/TUL, Howell owed Beck, as the minority equity holder in TUI/TUL, a fiduciary duty of fair dealing.

43.     Defendant Howell has breached his fiduciary duties to Beck and engaged in oppressive conduct by:

    (a)     failing to cause Beck to be paid his fair share of profit distributions between 2009 and 2011;

    (b)     exposing the company to liability for fraud by setting up various "front companies" to pose as women-owned businesses in order to obtain certain government contracts when, in fact, the "front" companies were staffed by TUI/TUL sales people and managed by TUI/TUL executives from TUI/TUL's offices;

    (c)     causing TUI/TUL and its affiliates to refuse Beck access to corporate books and records to which he is statutorily entitled pursuant to Maryland Code, Corporations and Associations, § 4-403, and/or § 4A-406;

    (d)     undermining Beck's ability to effectively manage the business by withholding critical information and diverting critical decision-making processes to other company executives;

    (e)     coercing Beck to execute the Mutual Release Letter Agreement under duress;

(f)     failing to cause the payment of Beck's severance pay; and

(g)     failing to distribute Beck's fair share of the true operating profits of Tech Direct Services, LLC.

44.     Howell's breaches of his fiduciary duties are intentional, malicious, and in reckless disregard of Beck's rights.

45.     Beck has suffered damages as a result of Howell's breaches of his fiduciary duties.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against the Defendants and asks this Court to:

A.     Award Beck compensatory damages in an amount to be determined at trial pursuant to Count II;

B.     Award Beck compensatory damages and punitive damages in a total amount to be determined at trial pursuant to Count III;

C.     Declare that the Mutual Release Letter Agreement is rescinded or alternatively, declare that it is unenforceable as it is null and void;

D.     Declare that Beck is entitled to receive three percent (3%) of TUI/TUL's annual profit distributions for 2012;

E.     Award such pre- and post-judgment interest as is available under law;

F.     Order TUI/TUL to make available to Beck the books and records of the Company and its affiliates, including tax returns, for the past three years; and

G.     Award such other and further relief, including an award of attorney's fees, as appropriate.

Plaintiff demands trial by jury on all issues so triable.

Respectfully submitted,

SCHWARTZ & ASSOCIATES PLLC

Dated:  September 28, 2012

By:____/s/ Kip Schwartz_____
Christopher "Kip" Schwartz (MD #13224)
Kip.Schwartz@schwartzassociates-law.com
Eric N. Heyer (MD #17486)
Eric.Heyer@schwartzassociates-law.com
1010 Wisconsin Avenue, N.W, Suite 540
Washington, DC  20007
Phone:  (202) 342-0413
Fax:  (202) 330-5272

*Counsel for Plaintiff Jason R. Beck*